Jin CHEN, Petitioner,

v.

UNITED STATES DEPARTMENT OF JUSTICE & Attorney General Gonzales,* Respondents.

Docket No. 03–41100.

United States Court of Appeals, Second Circuit.

Submitted: Aug. 5, 2005.

Decided: Sept. 23, 2005.

* United States Attorney General Alberto Gonzales is substituted for former Attorney General John Ashcroft as respondent. *See* Fed. R.App. P. 43(c)(2).

Bruno Joseph Bembi, Hempstead, NY, for Petitioner.

James A. McDevitt, United States Attorney for the Eastern District of Washington, William H. Beatty, Assistant United States Attorney, Spokane, WA, for Respondents.

POOLER and SOTOMAYOR, Circuit Judges, KORMAN, District Judge.**

POOLER, Circuit Judge.

Petitioner Jin Chen petitions for review of the Board of Immigration Appeals (BIA)'s November 20, 2003, order summarily affirming the Immigration Judge (IJ)'s decision, rendered orally on August 20, 2002, rejecting his claims for asylum and withholding of removal and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture"), December 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85, and ordering him removed to the People's Republic of China. We find that the IJ's denial of petitioner's claim of past persecution in the form of his wife's forced abortion and sterilization was not supported by substantial evidence, and we therefore vacate the BIA's order and remand for further proceedings.

## BACKGROUND

### Chen's Entry and Claim

Petitioner is a 29 year old male native and citizen of China. He entered the United States on August 12, 2001. He was served with a notice to appear in removal proceedings on August 24, 2001. Around February 8, 2002, he applied for asylum. In his application, Chen stated that (1) on November 2, 2000, his wife was ordered to submit to intra uterine device (IUD) insertion, and despite her refusal, was taken by force to a hospital at which an IUD was inserted; (2) the couple had the IUD removed by a private doctor, and in February 2001 Chen's wife became pregnant; (3) on March 8, 2001, about five cadres came to the couple's house to force Chen's wife to undergo an abortion, and despite the opposition of himself and his wife, his wife was arrested and taken by force to a hospital and made to have an abortion; (4) after the abortion, on April 5, 2001, Chen's wife was arrested and taken by force to a hospital to have an IUD inserted; (5) in May 2001, Chen began practicing Falun Gong with a friend; (6) on June 1, 2001, during a Falun Gong practice session at a friend's house, Chen went out to go shopping and when he came back the police had arrested his friends; (7) afraid that his friends would give his identity to the authorities, Chen went into hiding at a relative's house; (8) Chen's wife told him that on June 28, 2001, the police came looking for him and left with her a copy of a warrant for his arrest; and (9) Chen fears that if returned to China he will be arrested and imprisoned.

At his initial hearing appearance on November 16, 2001, Chen conceded removability, renewed his asylum application, and asserted claims to withholding of removal and relief under the Convention Against Torture.

### Evidence at the Hearing

The hearing proper commenced on August 20, 2002. At his hearing, Chen offered various corroborative documents into evidence: (1) a notarial birth certificate, dated October 15, 2001, issued by the Changle City Notary Public Office, stating that Chen Jin, a male, was born on December 3, 1975, in Changle City, Fujian Province, to Chen Shangguo and Lin Aifang;

** The Honorable Edward R. Korman, Chief Judge of the United States District Court for the Eastern District of New York, sitting by designation.

(2) a Chinese Resident Card issued on October 9, 2001, in the name of Jin Chen, stating that he was born on December 3, 1975, and giving an address in Changle City, Fujian Province; (3) a marriage license issued on November 2, 2000, to Jin Chen, born December 3, 1975, and Xiu Yun Zheng, born September 22, 1978, stating that they were qualified for marriage and would be allowed to register; (4) a notarial marriage certificate issued on October 15, 2001, by the Changle City Notary Public Office, stating that Zheng Xiuyun, a female born on September 22, 1978, and Chen Jin, a male born on December 3, 1975, married at the registry office on April 7, 1999, in Hangchen Town, Changle City, Fujian Province; (5) a notarial birth certificate issued October 15, 2001, by the Changle City Notary Public Office, stating that Zheng Xiuyun, a female, was born on September 22, 1978, at Changle City, Fujian Province, to Zheng Zengjin and Cai Yuzhi; (6) a notarial birth certificate issued on October 15, 2001, by the Changle City Notary Public Office, stating that Chen Rouqi, a female, was born on July 29, 2000, at Changle City, Fujian Province, to Chen Jin and Zheng Xiuyun; (7) a household registry issued on October 19, 2001, listing Jin Chen, a male born on December 3, 1975, in Changle County, Fujian Province, as head of household, Xiu Yun Zheng, a female born September 22, 1978, in Changle City, Fujian Province, as his wife, and Rou Qi Chen, a female born July 29, 2000, in Changle City, Fujian Province, as his eldest daughter; (8) a "Changle County Birth Control Operation Certificate," "NO: 0006945,"[1] dated November 2, 2000, issued by Fujian Province Changle City Hospital "For Birth Control Used Only," signed by Doctor Li Yu Lin, certifying that "comrade Xiu Yun Zheng

residing at Liren village (committee) Hangcheng town on November 2nd, have an IUD implanted in this office;"(9) a "Changle County Birth Control Operation Certificate," "NO: 0007585,"[2] dated March 8, 2001, issued by Fujian Province Changle City Hospital "For Birth Control Used Only," signed by Doctor Ya Hua Chen, certifying that "comrade Xiu Yun Zheng residing at Liren village (committee) Hangcheng town on March 8th, underwent an abortion operation in this office;"(10) a "Changle County Birth Control Operation Certificate" "NO: 0005805," dated April 15, 2001, issued by Fujian Province Changle City Hospital "For Birth Control Used Only," signed by Doctor Mei Hua Zheng, certifying that "comrade Xiu Yun Zheng residing at Liren village (committee) Hangcheng town on April 15th, have an IUD implanted in this office;" and (11) a photograph of a Chinese man and woman holding a baby. Chen also submitted various forms of background evidence including newspaper articles about the treatment of Falun Gong practitioners in China, and the "State Department 2000 Annual Report on International Religious Freedom: China." The Government submitted the State Department's 1998 China profile.

Chen testified that he was married to Zhou Ying Chen on July 4, 1999, and registered his marriage that same day. He and his wife have one daughter, Lo Chi Zhou, who was born on July 29, 2000. Chen lived in Li Yan village, Chen Lo City, Fuzhou, Fujian Province from birth until he left China in August 2001. He stated that he left because of persecution "by the [Chinese] birth policy." In particular, in February 2001, his wife discovered that she was pregnant, and five or six

---

**1.** The translation in the record incorrectly states "0005805."

**2.** The translation in the record incorrectly states "0005805."

village cadres came on the morning of March 8, 2001, to take her for a forced abortion. Chen argued with them but they still took his wife away. Chen did not go with his wife to the hospital because the cadres refused to allow him to come. When his wife came home that evening she reported to Chen that she had been forced to have an abortion, and she was crying and in much pain. On April 15, 2001, some cadres came to force Chen's wife to have an IUD inserted. Chen was not home when they came, but when he got home his wife told him about it.

Chen asserted that in May 2001, he "joined the Falun Gong and practiced Falun Gong." He was introduced to Falun Gong by his friend Wi Chung. He described Falun Gong as a "practice for better health," that involves sitting and putting one's hands together. He practiced once a week at his friend's house. On June 1, 2001, the group of practitioners was apparently reported to authorities, and the police came to arrest them. Luckily, Chen had left the house and was not arrested, but he saw what happened from a store across the street. Chen stated that he knew that Falun Gong was illegal in China because the authorities considered it a "cult," but that he practiced it anyway because he "didn't know it was that serious." After the arrests, fearing that he would himself be arrested, Chen fled the area to stay with a relative. For two months, Chen did not return home because of his fear of being arrested. Chen's wife told him that the police came to his house on June 28, 2001, seeking to arrest him. The police gave Chen's wife a copy of a warrant for his arrest, but she tore it up and so he never received a copy. Chen stopped practicing Falun Gong after coming to the United States because he had no time to do so, on account of the amount of time he was required to work in order to pay off the people who smuggled

him into the United States. He owes these smugglers $20,000.

Chen testified that he had seen the receipts for abortion and IUD insertion that he submitted into evidence while he was in China. His wife brought them home from the hospital on the dates of her forced medical procedures. Chen did not bring them with him from China, but rather, his wife mailed them to him after his arrival here.

After Chen testified regarding the abortion and subsequent IUD insertion, his attorney asked him if he had any "other further family planning problems." He replied, "no." However, after he testified to authenticate the certificates for the abortion and subsequent IUD insertion, he mentioned for the first time that his wife had been forced to submit to insertion of an IUD prior to the abortion, after the birth of the couple's first child. This occurred on November 2, 2000. That morning, while Chen was at work, several cadres took his wife away for IUD insertion. She told Chen about this after he came home later that day. Chen explained that he had not mentioned this in response to his attorney's earlier questions because he "didn't hear clearly." But he stated that now he was sure there were no other family planning related problems to report. Chen stated that he received the certificate associated with the earlier IUD insertion by mail along with the other certificates.

On cross-examination the Government first asked how the cadres discovered that Chen's wife was pregnant, since according to his testimony they arrived when she was only two months pregnant and therefore she should not have been visibly pregnant. Chen replied that he believed his neighbors probably overheard him talking about the pregnancy. The Gov-

ernment then asked how authorities could have discovered that he and six friends were practicing Falun Gong. He stated that neighbors probably turned them in. The Government then asked why Chen had not practiced Falun Gong since arriving in the United States. Chen again stated that he had no time to do so because he had to work a lot.

After the Government finished its cross-examination, the IJ asked a series of questions. The IJ first asked why Chen had not submitted a letter from his wife to corroborate his story. Chen responded, "I didn't ask her." The IJ asked why Chen had not provided a statement from his friend with whom he practiced Falun Gong. Chen responded that his friend had been arrested. The IJ asked why Chen had not provided a statement from the relative with whom he went into hiding. Chen responded, "I did not know that I need-that useful." The IJ asked how Chen left China. Chen stated that he flew from Shanghai to Korea. The IJ asked if Chen had presented a passport when leaving China. Chen stated that he presented a fake passport that he had purchased and that bore his photo but someone else's name. Chen said that he was afraid of being arrested, but he was willing to risk it to get out of China and avoid an even greater danger of being arrested. The IJ asked if Chen was ever a leader or master of Falun Gong. Chen stated that he was not. Finally, the IJ noted that the numbers on the birth control certificates that Chen submitted were "out of sequence." The IJ asked Chen if he could explain this. Chen said that the certificates were not issued at the same time, that his wife was given them when the operations occurred, and that they "didn't even pay attention to the numbers."

### The Immigration Judge's Decision

At the end of the hearing, the IJ delivered his oral opinion, denying Chen's claims for asylum, withholding, and relief under the Convention Against Torture. The IJ explained that as to both of Chen's asserted grounds for asylum, he "had provided an abbreviated general account of what had occurred," and his testimony was "scant of details" and "lack[ed] specificity," particularly regarding "the abortion event and with regard to the respondent's reasons and involvement in the practice of Falun Gong." The IJ also "found with regard to the respondent's claim for relief under family planning that the respondent's presentation was not credible due to the documents that he had provided." In particular, the IJ noted that the numbers of the birth control certificates that Chen submitted were out of sequence: the November 2, 2000, document was numbered "0006945," the March 8, 2001, one was numbered "0007585," but the last one, dated April 15, 2001, had the earliest number, "0005805." The IJ explained that "the numbers bear no sequential relation to each, other than it appears to have been random. Court finds this to be adverse to the respondent's claim. Certainly with regard to medical documentation there should be a semblance of order with regard to the numbering of the documents. It would appear that the documents are a fabrication."

Regarding Chen's story about Falun Gong, the IJ stated that Chen had given "an abbreviated general account that lacks specifics and lacked details." The IJ also found Chen's claim incredible because he has not continued to practice Falun Gong since arriving in the U.S. despite the ability to do so without fear of arrest. The IJ also found Chen's claim undermined by his failure to provide corroborative statements from his wife or the relative with whom he went into hiding. The IJ found it implausible that Chen's wife was given a copy of

his arrest warrant but tore it up, and that he was able to leave through an airport without being discovered by government officials despite the existence of an outstanding warrant for his arrest. The court thus found that Chen did not demonstrate eligibility for asylum, and therefore certainly failed to meet the higher burden for showing entitlement to withholding. The IJ also concluded that Chen "has not demonstrated eligibility for withholding of removal under the Convention against Torture."

### Appeal to the BIA and Petition for Review by this Court

Chen timely appealed to the BIA, challenging each of the IJ's findings. The BIA summarily affirmed by order dated November 20, 2003. Chen timely petitioned for review by this Court. Chen argues that (1) the IJ's adverse credibility finding was not supported by substantial evidence because (a) the IJ's conclusion that the numbers on the birth control certificates should have been sequential was based solely on speculation and not supported by record evidence, such as forensic evidence, which the government had ample time to procure, (b) the IJ erred in holding Chen responsible for clerical errors on his documentary evidence, (c) the IJ's conclusion that it was implausible that Chen's wife tore up the arrest warrant was supported by nothing more than the IJ's "desire to disbelieve Mr. Chen," and (d) the IJ erred in describing Chen's testimony as "scant of details" and "lack[ing in] specificity" when the testimony established every element required to prove eligibility for asylum; (2) the IJ erred in requiring additional corroboration when Chen had provided substantial documentary corroborative evidence relating both to general country conditions and to his particular claim; (3) Chen met his burden of proof as to asylum and is entitled to outright rejection of the BIA's

order; and (4) the IJ erred in holding that relief under the Convention Against Torture could not be available where a petitioner failed to show eligibility for asylum, because relief under the Convention has wholly different elements from asylum.

We find the IJ's rejection of Chen's claim based on his wife's forced abortion and IUD insertions to be unsustainable, because the IJ's adverse credibility finding was not supported by substantial evidence. We therefore vacate the BIA's order and remand for further proceedings. We find Chen's other claims lacking in merit.

### DISCUSSION

#### I. Requirements to Establish Eligibility for Asylum

"To establish eligibility for asylum, a petitioner must show that he is a 'refugee' within the meaning of the Immigration and Nationality Act, i.e., that he has suffered past persecution on account of 'race, religion, nationality, membership in a particular social group, or political opinion,' or that he has a well-founded fear of future persecution on these grounds." *Qiu v. Ashcroft*, 329 F.3d 140, 148 (2d Cir.2003) (quoting 8 U.S.C. § 1101(a)(42)). Once an asylum applicant has established eligibility for asylum, the decision whether to grant asylum rests with the discretion of the Attorney General, *see* 8 U.S.C. § 1158(b)(1), and is generally not reviewable unless "manifestly contrary to law and an abuse of discretion," 8 U.S.C. § 1252(b)(4)(D); *see also Melendez v. United States Dep't of Justice*, 926 F.2d 211, 216–18 (2d Cir.1991) (holding that while BIA's findings of fact informing decision whether applicant is eligible for asylum are reviewed for substantial evidence, ultimate discretionary determination whether to grant asylum is reviewed for abuse of discretion).

The BIA originally held that application of the Chinese "one family, one child" policy did not constitute persecution on account of any of the enumerated grounds and so did not suffice to establish eligibility for asylum. *See In re Chang*, 20 I. & N. Dec. 38, 43 (BIA 1989). But in 1996 Congress passed legislation providing that forcible application of this policy constitutes persecution on account of political opinion:

> [A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(a)(42). The BIA has since held that the forcible application of the Chinese family planning policy to a male applicant's wife constitutes persecution as to the male applicant, allowing him to stand in the shoes of his wife in establishing eligibility for asylum on the basis of her forced sterilization or abortion. *See In re C–Y–Z–*, 21 I. & N. Dec. 915, 918–19 (BIA 1997).

While establishing a well-founded fear of future persecution automatically establishes an applicant's eligibility for asylum, establishing past persecution creates only a rebuttable presumption of such a well-founded fear and thus of eligibility for asylum. The government may generally overcome this presumption by showing, by a preponderance of the evidence, that conditions in the country from which the applicant fled have changed sufficiently that any such fear is no longer well-founded, *see Qiu*, 329 F.3d at 148, or that the applicant could avoid persecution by relocating to a different region of that country and that it would be reasonable to expect him to do so, *see* 8 C.F.R. § 208.13(b)(1)(i)(B). The BIA has held that because the persecution of forcible sterilization is "permanent and continuous," the presumption of a well-founded fear of future persecution is not rebutted by the mere fact that sterilization itself renders future sterilization or abortion unlikely. *See In re Y–T–L–*, 23 I. & N. Dec. 601, 605–08 (BIA 2003); *see also Qu v. Gonzales*, 399 F.3d 1195, 1202–03 (9th Cir. 2005) (following *Y–T–L–*). Even in the absence of a well-founded fear of future persecution, an applicant who has established past persecution may be granted asylum in the exercise of discretion for certain compelling humanitarian reasons such as the severity of the past persecution or the likelihood that serious harm, not attributable to persecution, would follow removal. *See* 8 C.F.R. § 208.13(b)(1)(iii).

Therefore, a showing by Chen that his wife was subjected to a forced abortion in China would, under *C–Y–Z–*, establish that Chen suffered past persecution, which would lead to a presumption of a well-founded fear of future persecution and thus of his eligibility for asylum.

## II. Standard of Review

 We defer to the BIA's reasonable constructions of the immigration laws. *See Liao v. United States Dep't of Justice*, 293 F.3d 61, 66 (2d Cir.2002). The BIA may properly summarily affirm the IJ's decision and thereby adopt its reasoning, *see* 8 C.F.R. § 1003.1(e)(4)(i), so long as the IJ's decision is sufficient to allow for meaningful review, *see Shi v. Board of*

*Immigration Appeals*, 374 F.3d 64, 66 (2d Cir.2004), and the BIA fulfilled its duty to conduct its own independent review. *Cf. Secaida–Rosales v. INS*, 331 F.3d 297, 305 (2d Cir.2003) ("The BIA is certainly not precluded from summarily affirming an IJ's decision and adopting the IJ's reasoning in doing so, as long as the IJ's decision is sufficient to allow for review and we are confident that the BIA fulfilled its duty to independently review a petitioner's case."). In such a case, we will review the IJ's decision directly. *Id.*

 Our review is for "substantial evidence," and we will "revers[e] only if no reasonable fact-finder could have failed to find" petitioner eligible for relief. *Ramsameachire v. Ashcroft*, 357 F.3d 169, 177 (2d Cir.2004) (internal quotation marks omitted). We will affirm if the IJ's finding is supported by evidence that is "reasonable, substantial, and probative" when considered in light of the record as a whole. *Diallo v. INS*, 232 F.3d 279, 287 (2d Cir. 2000). But this Court's review is limited "to the reasoning of the IJ, and we will not search the record independently for a basis to affirm the BIA." *Secaida–Rosales*, 331 F.3d at 305.

 We "afford particular deference in applying the substantial evidence standard" when reviewing an IJ's credibility findings. *Zhang v. United States INS*, 386 F.3d 66, 73–74 (2d Cir.2004) (internal quotation marks omitted). Nevertheless, "the fact that the BIA has relied primarily on credibility grounds in dismissing an asylum application cannot insulate the decision from review." *Ramsameachire*, 357 F.3d at 178. In particular, where the IJ's finding rests largely on credibility, we require the IJ to detail the reasoning leading to her adverse finding, requiring the IJ to give "specific, cogent" reasons for rejecting the applicant's testimony. *Secaida–Rosales*, 331 F.3d at 307. The reasons

given "must bear a legitimate nexus to the finding" and must be "valid grounds," as a matter of logic, for rejecting the applicant's testimony. *Id.* We give particular deference to credibility determinations that are based on the adjudicator's observation of the applicant's demeanor, in recognition of the fact that the IJ's ability to observe the witness's demeanor places her in the best position to evaluate whether apparent problems in the witness's testimony suggest a lack of credibility or, rather, can be attributed to an innocent cause such as difficulty understanding the question. *See Zhang*, 386 F.3d at 73. On the other hand, we grant lesser deference to credibility determinations that are based on analysis of testimony as opposed to demeanor. *See Secaida–Rosales*, 331 F.3d at 307. "[W]e will reverse where [an] adverse credibility determination is based upon speculation or upon an incorrect analysis of the testimony." *Ramsameachire*, 357 F.3d at 178; *see also Secaida–Rosales*, 331 F.3d at 307 (holding that speculation and conjecture cannot support an adverse credibility finding).

 An applicant should provide any reasonably available documentation to corroborate the elements of her claim, or explain why such documentation is unavailable, and an IJ may rely on the applicant's failure to do so in finding that the applicant has not met her burden of proof. *See Zhang*, 386 F.3d at 78. We review an IJ's finding that corroborative evidence was available for substantial evidence, and will not reverse unless a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable. But we may remand where the IJ has "turn[ed] down a refugee candidate for want of sufficient corroboration" without "identify[ing] the particular pieces of missing, relevant documentation" or without relying on substantial evidence in the rec-

ord to find that "the documentation at issue was reasonably available to the petitioner." *Qiu,* 329 F.3d at 153. The IJ should also assess the applicant's reasons, if any, for not furnishing the corroboration at issue. *Diallo,* 232 F.3d at 287.

### III. The IJ's Adverse Findings as to Asylum Eligibility

As noted, the IJ based his adverse credibility finding as to Chen's claimed fear of persecution by a coercive population control policy on (1) his evaluation of Chen's testimony as "scant of details" and "lack[ing] specificity," and (2) the fact that the corroborative certificates submitted by Chen bore numbers that were not sequential. The IJ based his adverse credibility finding as to Chen's claimed fear of persecution on account of religion or membership in a particular social group as a Falun Gong practitioner on (1) his evaluation of Chen's testimony as "abbreviated," "general," and "lack[ing] details," (2) the fact that Chen stopped practicing Falun Gong after his arrival in the United States, (3) the implausibility of Chen's story that his wife was given a copy of his arrest warrant and tore it up, and (4) the implausibility of Chen's story that he was able to leave China through the Shanghai airport using a passport bearing his photograph and a fake name when there was supposedly an outstanding arrest warrant for him at the time.

#### A. Chen's Claimed Fear of Persecution By a Coercive Population Control Program

 The IJ's rejection of Chen's claim based on coercive population control cannot be sustained, because it rested on an adverse credibility finding that was not supported by substantial evidence. Even under our deferential standard of review, neither of the two grounds relied on by the

IJ in support of this adverse finding can withstand scrutiny. First, the IJ's evaluation of Chen's testimony as "scant of details" and "lack[ing] specificity" was incorrect as a matter of law. "[T]estimony is 'too vague' if it doesn't identify facts corresponding to each of the elements of one of the 'refugee' categories of the immigration statutes . . . ." *Qiu,* 329 F.3d at 151 (citing *Liao,* 293 F.3d at 70). In *Qiu* we explained that whereas in *Liao* the petitioner's testimony was too vague to make out his claim because he failed to identify the people who destroyed his house and hunted for him as government officials, "Qiu testified that his wife was apprehended for sterilization by . . . 'brigade cadres,' " and explained that his wife did not consent to sterilization but had to be taken by force. *Qiu,* 329 F.3d at 151. Because his testimony was specific as to the essential facts-the forced sterilization, and that it was coerced by government officials-Qiu's testimony was sufficiently specific to establish past persecution. *Id.* The same is true of Chen's testimony. His testimony established that village cadres forcibly arrested his wife and coerced her to have an abortion as well as two IUD insertions. It was therefore not "scant of details" or "lack[ing] specificity" in any material sense that could support an adverse credibility finding. As we pointed out in *Qiu,* where testimony is "spare" yet specific and detailed enough to support the essential elements of an applicant's claim, "the IJ or the [Government] may fairly wonder whether the testimony is fabricated," and "the IJ and counsel for the [Government] may wish to probe for incidental details, seeking to draw out inconsistencies that would support a finding of lack of credibility." *Id.* at 152. Here, however, the IJ and Government failed to do so and thus failed to create a record that could support the IJ's adverse finding.

■ The IJ's finding that the birth control certificates that Chen submitted in support of his claim "appeared fabricated" was also not supported by substantial evidence, but rather, was grounded solely on speculation and conjecture. As Chen points out, the Government was in possession of these documents for months prior to the merits hearing, and had ample opportunity to procure evidence to impeach them. It procured none, nor is there any indication in the record that the Government made any attempt to do so. Because all three certificates were signed by different doctors, there is no reason to assume that they would be sequentially numbered. Chen testified sufficiently to authenticate the certificates, and his response to the IJ's inquiries regarding the numbering-that he paid no attention to the numbers and did not know why they were out of sequence-was not implausible. *Cf. Shah v. INS,* 220 F.3d 1062, 1068 (9th Cir.2000) (holding that typographical or clerical errors in documents cannot form the basis of an adverse credibility finding against petitioner). As with the IJ's finding that Chen's testimony lacked detail or specificity, the Government again failed to create a sufficient record to support the IJ's adverse finding.

■ An asylum claim may be sustained on the basis of credible testimony alone, and a lack of corroboration is not a sufficient basis on its own for denying a claim where testimony was credible, specific, and detailed. *See Diallo,* 232 F.3d at 287–88; 8 C.F.R. § 208.13(a). Therefore, to the extent that the IJ relied on the lack of corroboration of Chen's claims, such a finding was inextricably intertwined with the IJ's erroneous findings that Chen's testimony in support of his claim based on coercive population control was incredible and lacking in detail or specificity. We therefore cannot affirm on the alternative ground that Chen failed to discharge his burden of proof by failing to submit sufficient corroboration. Accordingly, we find remand necessary to allow the IJ to reconsider Chen's claim based on coercive population control.

### B. Chen's Claimed Fear of Persecution on Account of Religion or Membership in the Falun Gong

■ The IJ's finding that Chen's claimed fear of persecution on account of his Falun Gong participation was not credible was supported by substantial evidence. Of the four grounds on which the IJ relied, only one was at all problematic. The IJ's assumption that airport officials in Shanghai would immediately recognize on visual inspection every minor wanted criminal in a country with a population of over 1.2 billion does seem to defy logic. However, the IJ's other three grounds for refusing to credit Chen's story were sound. Chen's account of his participation in Falun Gong was, as the IJ found, "abbreviated," "general," and lacking in details. In contrast to Chen's testimony in support of his claim based on coercive population control, here Chen's testimony was vague as to his religious beliefs, which are an essential element of a claim of religious persecution. It was reasonable for the IJ to conclude that Chen did not give an impression of having very much understanding of or commitment to Falun Gong practices or philosophy. The fact that he ceased practicing as soon as he arrived in the U.S. further undermined any claim that he held a religious belief or membership in a religious group on the ground of which he could be persecuted. The IJ did not err in finding implausible Chen's story that his wife was given, and tore up, a copy of a warrant for his arrest.

### IV. The IJ's Denial of Relief Under the Convention Against Torture

Chen argues that the IJ's statement that "the Court also finds that the respondent

has not demonstrated eligibility for withholding of removal under the Convention against Torture" immediately followed his statement that "[a]s the respondent failed to demonstrate eligibility for asylum, he has also failed to meet the higher burden of proof necessary for withholding of removal," demonstrates that the IJ incorrectly assumed that an applicant's lack of eligibility for asylum automatically entails a lack of eligibility for relief under the Convention. While such a mechanical relationship does exist between asylum and withholding, asylum and Convention Against Torture relief are wholly distinct inquiries with entirely different elements. *See Ramsameachire,* 357 F.3d at 184–85.

While the IJ did not present any explicit analysis of Chen's claim under the Convention, we do not find Chen's argument convincing. Linguistically, the IJ's denial of relief under the Convention appears, as required, to be logically separate from his denial of asylum and withholding; and as a practical matter, Chen provided no evidence whatsoever that he is likely to be tortured if returned to China.

Chen argues that the IJ should have considered (1) whether Chen's wife's forced abortion constituted torture of Chen, and (2) whether background materials established that Falun Gong members were likely to be tortured. Because we affirm the IJ's finding that Chen failed to prove he was a Falun Gong member, we reject the latter argument. Because we remand for further proceedings on Chen's claim that his wife was subjected to coercive population control, Chen may pursue the former argument before the IJ and BIA on remand, and we will allow the IJ and BIA to address it in the first instance.

## V. Appropriate Remedy

█ Relying on the decision of the Ninth Circuit Court of Appeals in *He v.*

*Ashcroft,* 328 F.3d 593 (9th Cir.2003), Chen argues that, once it is concluded that the IJ's adverse credibility finding was not supported by substantial evidence, he must be deemed credible, and is therefore entitled to reversal of the BIA's order, i.e., a finding that he is eligible for asylum, and to remand for a determination of whether he will be granted asylum in the exercise of discretion. In *He* the court held that where credibility is the only issue in the case, and where it is accordingly clear that the applicant's story, if true, establishes eligibility for asylum, the appropriate course on finding that the BIA's adverse credibility finding was not supported by substantial evidence is to reverse and remand for a determination of whether asylum will be granted in the exercise of discretion, as well as to determine whether the applicant is entitled to withholding of removal. *He,* 328 F.3d at 604. The court reasoned that "[t]he [Government], having lost this appeal, should not have repeated opportunities to show that Mr. He is not credible any more than Mr. He, had he lost, should have an opportunity for remand and further proceedings to establish his credibility." *Id.*

This reasoning would perhaps be persuasive had the IJ based his credibility finding solely on an erroneous analysis of the birth control certificates. The Government failed, despite ample opportunity, to obtain or present evidence to impeach the certificates. Thus the Government failed to sustain its burden to create a record from which the IJ could conclude that those documents were fabricated. However, because the IJ also relied on an erroneous analysis of Chen's testimony, for which the Government bears no responsibility, we are not persuaded that this would be an appropriate case for reversal as opposed to remand, even assuming we were to adopt this reasoning in *He.*

Furthermore, the Supreme Court has advised that remand "for additional investigation or explanation" is appropriate "except in rare circumstances ...." *INS v. Ventura*, 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam). While *He* found the fact that credible testimony alone sufficed to establish the petitioner's claim to constitute, on its own, such a "rare circumstance," *He*, 328 F.3d at 603, we cannot agree. There is nothing "rare" about this circumstance. It is not at all uncommon for an asylum applicant's testimony to touch on each essential element of his claim. Accordingly, we find *He* to be in tension with the Supreme Court's explanation in *Ventura* of the rationale for remanding "except in rare circumstances." The Court explained that, "[g]enerally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands." *Ventura*, 537 U.S. at 16, 123 S.Ct. 353. Petitioner's eligibility for asylum is such a decision, as our statutorily limited standard of review manifests. *See* 8 U.S.C. § 1252(b)(4)(B).

Remand properly allows both parties an opportunity to present any additional evidence that "may well prove enlightening," *Ventura*, 537 U.S. at 18, 123 S.Ct. 353, and thus facilitates and strengthens the statutorily created administrative process. Because the opportunity to present additional evidence accrues equally to both parties, the Government is not the beneficiary of a windfall as implied by the Ninth Circuit in *He*.

## CONCLUSION

For the foregoing reasons, Chen's petition for review is granted, the BIA's order summarily affirming the IJ and ordering him removed to China is vacated, and the case is remanded for further proceedings consistent with this opinion.