**Chun GAO, Petitioner,**

v.

**Alberto R. GONZALES, Attorney General Respondent.***

**Docket No. 03–40509.**

United States Court of Appeals, Second Circuit.

Argued: May 16, 2005.

Decided: Sept. 9, 2005.

---

* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Alberto R. Gonzales is automatically substituted for former Attorney General John Ashcroft as the respondent in this case.

Aleksander Milch, (Michael Lehach, Christophe & Associates, P.C., on the brief), New York, N.Y., for Petitioner.

** The Honorable Arthur D. Spatt, Senior Judge, United States District Court for the

Nathan E. Wyatt, Assistant United States Attorney (Ronald J. Tenpas, United States Attorney for the Southern District of Illinois, on the brief), Fairview Heights, Ill., for Respondent.

Before: MINER and SACK, Circuit Judges, and SPATT, District Judge.**

MINER, Circuit Judge.

## I. *Introduction*

Petitioner-appellant, Chun Gao, a native and citizen of the People's Republic of China, petitions this Court for a review of a September 10, 2003, order of the Board of Immigration Appeals ("BIA"), summarily affirming a decision of an Immigration Judge ("IJ") dated January 24, 2002. The decision of the IJ rejected petitioner's applications for asylum and withholding of removal under sections 208 and 241 of the Immigration and Nationality Act of 1952, 8 U.S.C. §§ 1158(a) and 1231(b)(3), as well as his application for relief under the United Nations Convention Against Torture ("CAT"), adopted Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85; *see also* 8 C.F.R. § 208.16. The Government urges denial of review for the reasons given by the IJ in denying Gao's applications.

Where the BIA expressly adopts the IJ's findings and reasoning, as it did here, we review the decision of the IJ as if it were that of the BIA. *See Secaida–Rosales v. INS,* 331 F.3d 297, 305 (2d Cir.2003). Our review, in any event, must "be confined to the reasoning of the IJ, and we will not search the record independently for a basis to affirm the BIA." *Id.; see Yu Sheng Zhang v. United States Dep't of Justice,* 362 F.3d 155, 158–59 (2d Cir.2004) (per curiam).

Eastern District of New York, sitting by designation.

## II. *The Proceeding Before the IJ*

The only witness to give oral testimony at the hearing conducted by the IJ was petitioner Gao, who was represented by counsel, as was the Government. In addition to the testimony, the evidence presented included: Gao's application for political asylum and withholding of removal, accompanied by a narrative statement attached to the application; a U.S. State Department Country Report on China;[1] a medical certificate of the Changle City Public Health Association, pertaining to Gao's mother; a graduation certificate pertaining to the physician who treated Gao's mother; Gao's notarial birth certificate, household registration booklet, and graduation certificate; and a business license and tax certificate in the name of Gao's mother.

From his testimony and exhibits, the following story put forward by Gao emerged: In February of 1997, Gao and his mother opened a bookstore in Nungman, China, his hometown. Although he considered himself the owner and operator of the bookstore, the license and tax certificate for the business were in the name of his mother, Ai Hua Yang. He conducted the business in his mother's name because he was unmarried and "in . . . local custom . . . unmarried children are considered children." Gao lived with his mother in an apartment above the bookstore when the business was opened.

In 1998, Gao began working in Fuzhou, at the Fuda Elevator Company, while taking classes there three nights a week at the university. In Fuzhou, he occupied an apartment formerly belonging to his grandmother. Gao returned to his hometown, as time permitted, to assist his mother in the operation of the bookstore.

In June of 1999, Gao began selling books, magazines, and other materials pertaining to the Falun Gong movement.

Falun Gong (or Wheel of the Law, also known as Falun Dafa), blends aspects of Taoism, Buddhism and the meditation techniques of qigong (a traditional martial art) with the teachings of Li Hongzhi, who left the country in 1998. The [Chinese] [g]overnment estimates that there may be as many as 2.1 million adherents of Falun Gong; Falun Gong followers estimate that there are as many as 100 million adherents worldwide. Some experts estimate that the true number of Falun Gong adherents lies in the tens of millions. Despite the mystical nature of some of Li's teachings, Falun Gong does not consider itself a religion and has no clergy or formal places of worship.

*Country Report* § 2.c.

Gao was not an adherent of Falun Gong, nor was he very knowledgeable about its practices. In his testimony, he described Falun Gong as "that book concerning to, to your physical health." Gao sold the books only because they "[we]re the best sellers and [he and his mother could] make money" selling them. He obtained the books from a former high school classmate, Chen Fang Di, who also owned a bookstore.

In July of 1999, the practice of Falun Gong was outlawed by the Chinese government. Because of media reports that the practitioners of Falun Gong and the sellers of its literature were subject to arrest, Gao decided in September of 1999 to stop selling such literature. He and his mother moved the Falun Gong books and materials out of the store and into a warehouse at the rear of the store. Nevertheless, several policemen came to the bookstore in

---

1. U.S. Dep't of State, *Country Report on Human Rights Practices, 2000, China (incl. Hong Kong & Macau)* (Feb.2001) [hereinafter "Country Report"].

October of 1999. Gao was working in Fuzhou at the time, but his mother was at home. When Gao returned home that evening, he found his mother lying in bed with bruises and cuts on the left side of her face and on her left arm. Her kneecaps also were injured.

Gao's mother told him that she had sustained her injuries during a scuffle with the police, in the course of which she fell down the stairs in front of the store. She related that the police had pushed all the bookshelves onto the ground and had confiscated the Falun Gong books in the warehouse as well as the business license. She reported that the physical altercation with the police had erupted when she resisted the taking of the license.

Heeding his mother's advice that he leave at once, Gao returned immediately to his apartment in Fuzhou. Before he left, however, he tried to contact his friend, Chen Fang Di, who had supplied Gao with the Falun Gong literature. Gao spoke by telephone with Chen's grandmother, who informed him that the police had arrested Chen, confiscated his Falun Gong inventory, and closed his bookstore.

Gao stayed in his apartment in Fuzhou for only one night. The next day he traveled to Nanping, where his maternal aunt resided. He stayed with his aunt for three days and enlisted her help to take his mother for treatment to a medical doctor. The doctor later furnished a certificate attesting to his treatment of Gao's mother; translated, it states as follows: "Patient Ai Hua Yang was seriously injured and her knee(s) injured due to a fall in October 1999. In addition, her coronary heart disease has been deteriorating." After Gao left the home of his maternal aunt, he went to the home of his paternal uncle in Fuzhou. Gao alternated his residence between the two homes, and occasionally worked in Nanping repairing water heaters.

In October or November of 1999, Gao received a telephone call from a friend who was a fellow student at the university. This friend told him that the police had visited a dean of the university in an effort to discover Gao's whereabouts. Gao also remained in contact with his mother, who informed him that the police had visited her on a number of occasions as well. The police sought to arrest Gao in order to find out who had supplied him with Falun Gong literature and who had purchased it from the store.

After Gao left China on June 10, 2000, he remained in contact with his mother, who advised that the police continued to seek him out through her. In response to a question at the hearing as to why the police did not target his mother individually, Gao testified that his mother had a serious heart problem, that she might have had a heart attack if placed in custody, and that the local police officers in her village were aware of that possibility and acted accordingly.

### III. *The Decision of the Immigration Judge.*

In a somewhat disjointed oral decision, the IJ reached the following conclusions with respect to Gao's application for asylum: "[I]t must be vehemently emphasized that [Gao] did not sell Falun Gong books because he is a Falun Gong sympathizer or supporter. He sold Falun Gong books because it was profitable. [Gao], therefore, is not meritorious of political asylum." The IJ recognized that "the testimony [of an applicant] for asylum sometimes is the only evidence available and can suffice if it's believable, consistent, and sufficiently detailed in light of country conditions to provide a plausible account for the fear." The IJ went on, however, to state that

"[i]n this particular case, [she had] problems with [Gao's] credibility" and did "not find that his testimony [was] sufficiently credible and plausible to stand alone in support of his claims."

In support of her finding of a lack of credibility and plausibility, the IJ stated: "It makes absolutely ... no sense that [Gao's] mother has circumvented any problems with the police, and that the emphasis is on [Gao] even though he is not the licensed book seller or owner." The IJ also found that Gao's mother "presumably ha[d] never been interrogated" and had "had absolutely no problems with the [Chinese] government ... save for the one incident when the police came and ransacked the store." Rejecting Gao's explanation that the police took into consideration his mother's heart condition, the IJ stated that, if this supposition were true, it would "drastically undercut ... any testimony" regarding the "alleged campaign to eradicate all those ... connected with the Falun Gong movement."

Further commenting on the issue of credibility, the IJ stated as follows: "[Gao] insisted today in testimony that a famous, traditional doctor attended to his mother and ... issued a medical document to that effect; but there is no such medical document" in the Record. She concluded that "the medical documentation is not consistent with [Gao's] testimony at all and, therefore, creates a problem of credibility and plausibility."

Based on Gao's testimony that the police wanted to find out who sold the Falun Gong books to him and who purchased them from him, the IJ concluded that "the police [were] only looking to speak to [Gao]." A finding of past persecution or fear of future persecution, necessary to a grant of asylum, could not, according to the IJ, be predicated on the desire of police officers merely to speak with or question Gao. The IJ found it especially telling that Gao was neither the license holder nor the official store owner. The IJ concluded, on that basis, that Gao did not "fit[ ] into any particular social group" and that "there[ ][was] absolutely no nexus between [Gao] and ... any political opinion or any other such protected ground."

In light of these determinations, the IJ denied Gao's application for asylum as well as his application for withholding of removal. The IJ also denied Gao's application for relief under the CAT, finding that he "set forth absolutely no facts or circumstances to show that it is more likely than not that he would be tortured if forced to return to [China]."

## IV. *Analysis*

### A. *Asylum, Withholding of Removal, and Relief Under the Convention Against Torture*

Pursuant to § 208(b) of the Immigration and Nationality Act, 8 U.S.C. § 1158(b), an applicant for asylum must establish that he or she is a refugee, unable or unwilling to return to his or her native country because of "persecution or a well-founded fear of persecution on account of" one or more of five enumerated grounds: "[R]ace, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *Jin Shui Qiu v. Ashcroft*, 329 F.3d 140, 148 (2d Cir.2003). Once an individual proves either past persecution or a well-founded fear of future persecution, the Attorney General has discretion to grant asylum pursuant to 8 U.S.C. § 1158. *See Xin–Chang Zhang v. Slattery*, 55 F.3d 732, 737 (2d Cir.1995).

An alien has a well-founded fear when "a reasonable person in her circumstances would fear persecution if she were returned to her native country." *Carca-*

mo–Flores v. INS, 805 F.2d 60, 68 (2d Cir.1986). "Well-founded fear involves both a subjective and an objective component. The former may be based on the applicant's reaction to events that impinge on [her] personally; but to make it a well-founded fear, there must be other proof or objective facts that lend support to the applicant's subjective fear." Melendez v. United States Dep't of Justice, 926 F.2d 211, 215 (2d Cir.1991). "When an asylum applicant has demonstrated that she has been subjected to past persecution, there is a presumption that a well-founded fear of persecution exists." Melgar de Torres v. Reno, 191 F.3d 307, 311 (2d Cir.1999); see 8 C.F.R. § 208.13(b)(1); see also Melendez, 926 F.2d at 215. "Once demonstrated, the burden shifts to the Government to show, by a preponderance of the evidence, that country conditions have changed to such an extent that the petitioner no longer has a well-founded fear that she would be persecuted if she were to return to her native country." Melgar de Torres, 191 F.3d at 311; see 8 C.F.R. § 208.13(b)(1).

▮ For withholding of removal, "the applicant must meet the requirements of asylum eligibility and establish that it is more likely than not that were he or she to be deported his or her life or freedom would be threatened on account of one of the five bases for asylum." Islami v. Gonzales, 412 F.3d 391, 395 (2d. Cir. 2005); see 8 U.S.C. § 1231(b)(3)(A); Diallo v. INS, 232 F.3d 279, 284–85 (2d Cir. 2000). Since this is a burden heavier than that imposed for eligibility for asylum, it follows that an applicant unable to demonstrate eligibility for asylum cannot demonstrate eligibility for withholding of removal. See Abankwah v. INS, 185 F.3d 18, 22 (2d Cir.1999). However, if a showing for withholding of deportation is made, the Attorney General does not have the dis-

cretion afforded to him in an asylum case, and withholding must be granted. Id.

Article 3 of the CAT provides that "[n]o State Party shall expel [or] return ... a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85; see Ramsameachire v. Ashcroft, 357 F.3d 169, 184 (2d Cir.2004). Torture has been defined "as the intentional infliction of pain or suffering that is perpetrated or sanctioned by a nation's authorities." Id.; see also 8 C.F.R. § 208.18(a)(1). To establish eligibility for protection under the CAT, an applicant must demonstrate that " 'it is more likely than not that he or she would be tortured if removed to the proposed country of removal.' " Ramsameachire, 357 F.3d at 184 (quoting 8 C.F.R. § 206.16(C)(2)). The regulations provide the following:

In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:

(i) Evidence of past torture inflicted upon the applicant;

(ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;

(iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and

(iv) Other relevant information regarding conditions in the country of removal.

8 C.F.R. § 208.16(c)(3).

▮ Relief under the CAT requires the applicant to establish "that there is greater than a fifty percent chance (i.e. that it is

'more likely than not') that he will be tortured upon return to his or her country of origin." *Mu–Xing Wang v. Ashcroft*, 320 F.3d 130, 144 n. 20 (2d Cir.2003); 8 C.F.R. § 208.16(c)(2).

## B. *Legal Conclusions*

■ The principal reason[2] given by the IJ for denial of asylum and withholding of removal is found in the IJ's "vehement[ ] emphasi[s] that [Gao] did not sell Falun Gong books because he [was] a Falun Gong sympathizer or supporter" but, rather, "because it was profitable." The IJ thus focused on the thoughts, actions, and motives of Gao. But the question in this case is not whether Gao was or is a practitioner of Falun Gong, but whether authorities would have *perceived* him as such or as a supporter of the movement because of his activities. If authorities would persecute him as an adherent or as a supporter of Falun Gong, then such persecution would be "on account of" an enumerated ground.

Although we have not had the occasion to rule definitively on the matter, "there is wide endorsement of the concept of persecution on account of imputed political opinion." *Amanfi v. Ashcroft*, 328 F.3d 719, 728–29 (3d Cir.2003) (extending concept to "persecution on account of imputed status as a homosexual"). With respect to the perception of Falun Gong itself, the Ninth Circuit has noted "that the government's crackdown on Falun Gong practitioners is motivated by a *perceived* anti-government political opinion." *Hongke Zhang v. Ashcroft*, 388 F.3d 713, 720 (9th Cir.2004) (emphasis added). Here, the IJ failed to explore the question of whether this same political opinion was imputed to Gao by the Chinese authorities because he sold Falun Gong literature.

■ In agreement with the First Circuit, we accept the proposition "that an imputed political opinion, whether correctly or incorrectly attributed, can constitute a ground of political persecution within the meaning of the [Immigration and Nationality] Act." *Alvarez–Flores v. INS*, 909 F.2d 1, 4 (1st Cir.1990). Decisions of our sister circuits accept the same proposition. In *Al–Harbi v. INS*, the Ninth Circuit held that "a petitioner may establish a well-founded fear of persecution on account of a political opinion imputed to him by his persecutors, whether or not he actually holds that opinion." *Al–Harbi v. INS*, 242 F.3d 882, 888 (9th Cir.2001); *see also Najjar v. Ashcroft*, 257 F.3d 1262, 1289 (11th Cir.2001); *Morales v. INS*, 208 F.3d 323, 331 (1st Cir.2000); *Mya Lwin v. INS*, 144 F.3d 505, 509 (7th Cir.1998); *cf. Cruz–Diaz v. INS*, 86 F.3d 330, 332 (4th Cir. 1996).

The IJ certainly was on notice that Gao was advancing the theory of imputed political opinion. In his asylum application, Gao wrote: "The government ... believes that I am a supporter of the Falun Gong Movement." At his hearing, Gao testified: "They wanted to arrest me to find out where I obtained the books, and whom did I sell those books to." In emphasizing that Gao was not a Falun Gong adherent and that he sold Falun Gong books only for profit, however, the IJ failed to explore adequately the views held by the alleged persecutors with respect to Gao's support for the movement. Such perceived support, based on Gao's activities, would constitute an imputed political opinion sufficient to satisfy the requirement that any

---

**2.** For the reasons stated in Part IV.C below, we conclude that the IJ's credibility determination is not supported by the Record, even under the "particular deference" we accord

such findings. *See Zhou Yun Zhang v. INS*, 386 F.3d 66, 74 (2d Cir.2004). The IJ's stated "problems" with Gao's credibility are therefore not dispositive of his case.

persecution be "on account of" an enumerated ground.

The IJ simply failed to come to grips with the proposition that Gao is eligible for asylum or withholding of removal if the authorities persecuted him or would persecute him in the future, or if it is more likely than not that they would threaten his life or freedom, on the basis of their belief—however mistaken—that he was a member or supporter of the Falun Gong movement. The mere fact that Gao sold the books only for profit cannot control the disposition of these claims. The failure of the IJ to analyze the issue of imputed political opinion requires us to remand the case to the BIA for that purpose.

There is no dispute that those who are considered practitioners of Falun Gong are subject to persecution in China. According to the *Country Report:*

> According to credible estimates, as many as 5,000 Falun Gong practitioners have been sentenced without trial to up to [three] years of reeducation through labor. Human rights organizations estimate that as many as 300 practitioners have been sentenced to prison terms of up to [eighteen] years for their involvement in Falun Gong. According to the Falun Gong, hundreds of its practitioners have been confined in mental hospitals.
>
> Police often used excessive force when detaining peaceful protestors, including some who were elderly or who were accompanied by small children. During the year, there were numerous credible reports of abuse of Falun Gong practitioners by the police and other security personnel, including police involvement in beatings, detention under extremely harsh conditions, and torture . . . .

*Country Report* § 2.c. Those who print and distribute Falun Gong literature also have been subjected to persecution:

> [S]everal persons accused of printing and distributing Falun Gong literature were arrested in Chaoyan, Liaoning Province. According to Amnesty International, two sisters, Li Xiaobing and Li Xaiomei, who owned a bookstore[,] were sentenced on January 28 to [seven] and [six] years in prison, respectively. They reportedly had been arrested in July 1999, just prior to the ban on Falun Gong, were held incommunicado without charge for [three] months, and were tried in secret.

*Id.* In granting withholding of removal, a sister circuit found that it was "more likely than not that [the petitioner] would be arrested, imprisoned, and abused based on his practice of Falun Gong, *and his distribution of Falun Gong materials to family and friends in China." Hongke Zhang,* 388 F.3d at 719 (emphasis added).

▇ The IJ failed to analyze whether the evidence supported Gao's theory of imputed political opinion, and must do so on remand. *See Amanfi,* 328 F.3d at 730. The burden remains on Gao to "show that his persecutors actually imputed a political opinion to him." *Sangha v. INS,* 103 F.3d 1482, 1489 (9th Cir.1997). Imputed political opinions have been found in various contexts and, once found, "this imputed view becomes the applicant's political opinion as required under the [Immigration and Nationality] Act." *Id.*

In the absence of any evidence whatsoever in the record to show that Gao is likely to be tortured if he were returned to China, however, the determination of the IJ to deny relief under the CAT was fully supported. *See Mu–Xing Wang,* 320 F.3d at 134.

## C. Factual Findings

The factual findings of the IJ, which are scattered throughout the oral opinion,

must be reconsidered and reevaluated on remand because some of those findings lack the support of substantial evidence in the Record, *see Jin Shui Qiu*, 329 F.3d at 154–55, and some are predicated upon an inaccurate perception of the Record, *see Chen v. INS*, 359 F.3d 121, 127 (2d Cir. 2004). For example, the IJ rejected Gao's testimony that a doctor had provided a medical document attesting to the injuries sustained during his mother's altercation with the police; the IJ concluded simply: "[T]here is no such medical document." But such a document does indeed exist and was introduced as an exhibit at the hearing before the IJ.

 The IJ found that Gao's mother "presumably has never been interrogated." But there is no basis in the Record for such a presumption, especially since the IJ apparently accepted the occurrence of the "one incident when the police came and ransacked the store." Moreover, according to the testimony, there were also a number of occasions when the police revisited Gao's mother after the incident. The only inference that reasonably can be drawn from these facts is that the visits made by the authorities were not social in nature.

The IJ, however, concluded from Gao's testimony that the police were looking for Gao merely to "speak to him." While Gao was aware that the police wanted to find out from him the names of those from whom he had gotten the Falun Gong books and of those to whom he had sold the books, he also assumed that the authorities believed he was a Falun Gong supporter and therefore were seeking him out for other reasons as well. Indeed, it appears that the police visited on several occasions in an effort to find him.

 Although the IJ·did not find Gao's testimony totally incredible, she did state: "I do have problems with [Gao's]

credibility, and I do not find that his testimony is sufficiently credible and plausible to stand alone in support of his claims." In the case of an adverse credibility finding, we ask

if the IJ has provided specific, cogent reasons for the adverse credibility finding and whether those reasons bear a legitimate nexus to the ·finding. In short, our review is meant to insure that credibility findings are based upon neither a misstatement of the facts in the record nor bald speculation or caprice.

*Zhou Yun Zhang v. INS*, 386 F.3d 66, 74 (2d Cir.2004) (citations and internal quotation marks omitted).

 Here, we conclude that the issue of Gao's credibility must be reviewed on remand as part of the hereby ordered reconsideration of the factual findings made by the IJ. In rejecting the "credibility and plausibility" of Gao's testimony, the IJ concluded, as noted above, that "[i]t makes absolutely . . . no sense that [Gao's] mother has circumvented any problems with the police, and that the emphasis is on [Gao] even though he [was] not the licensed book seller or owner." It certainly cannot be said, however, that Gao's mother has had *no* problems with the authorities; and there is substantial evidence that the police were looking for Gao despite the fact that he was not the "licensed" owner of the bookstore. ·

The IJ also found Gao's credibility lacking in "his explanation . . . that the police and local authorities did not bother his mother because they knew she had a heart condition." But in view of the testimony accepted by the IJ, it cannot be said that the authorities did not "bother" Gao's mother, and, indeed, Gao never so testified. He did testify that, presumably because of her heart condition, the police did not *arrest* his mother. According to the

Country Report, prisoners in Chinese prisons often encounter serious problems in obtaining timely and adequate medical care.

Assuming the truth of Gao's "explanation" (as the IJ improperly characterized his testimony) would, according to the IJ, "drastically undercut the value of any testimony surrounding th[e] alleged campaign to eradicate all those that [sic] are in any form or fashion connected with the Falun Gong movement." Even disregarding the IJ's flawed logic, it must be noted that Gao has not alleged, and the Record does not indicate, a plan to "eradicate" all those connected with Falun Gong. The Record does, however, clearly indicate a concerted effort on the part of the Chinese government to persecute such individuals.

The foregoing observations relating to misstatements of certain facts and misapprehensions of the Record on the part of the IJ should be considered on remand along with the issue of imputed political opinion.

## V. *Conclusion*

In accordance with the foregoing, we deny Gao's petition for review insofar as it pertains to his claim under the CAT. We grant the petition to the extent that we remand to the BIA, for further proceedings consistent herewith, Gao's petition for review insofar as it pertains to his claims for Asylum and Withholding of Removal.