**Li Zu GUAN,[1] Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 02–4302.

United States Court of Appeals, Second Circuit.

Argued: March 2, 2005.

Decided: June 29, 2006.

---

1. The Clerk is requested to modify the official caption to reflect the correct order of Li's name.

Sunit K. Joshi, Wilson, Joshi & Kuzmin, LLP (Vlad Kuzmin, on the brief), New York, N.Y., for Petitioner.

Maria M. Mlynar, Attorney, Office of Immigration Litigation, for Peter D. Keisler, Assistant Attorney General, Civil Division, U.S. Department of Justice (Linda S. Wernery, Senior Litigation Counsel, Office of Immigration Litigation, on the brief), Washington, D.C., for Respondent.

Before: CALABRESI, POOLER, and B.D. PARKER, Circuit Judges.

CALABRESI, Circuit Judge:

Li Zu Guan ("Petitioner" or "Li") petitions this court for review of a June 19, 2002 order of the BIA summarily affirming the September 14, 1998 denial, by an IJ, of Li's requests for asylum and for withhold-

ing of removal.[2] Li sought this relief on the grounds that he and his wife had been persecuted for violating the family planning policies of the People's Republic of China ("China") by having more than one child. The IJ found Li not to be credible, and for that reason denied relief. Before this court, Li asserts that the IJ's findings were not supported by substantial evidence and alleges several specific errors. We agree with Li that the IJ's credibility finding rested, in part, on errors. And because we cannot conclude with confidence that the BIA would reach the same result on remand in the absence of errors, we grant Li's petition for review.

## I. Background

### A. *Li's Claims*

Li testified to the following facts at his removal hearing. Except where noted (in footnotes), Li's in-court testimony is consistent with a statement that he submitted in 1997 to accompany his I–589 asylum application ("the I–589 statement").[3] Li testified that he had a wife, whom he married in 1982,[4] and two children in China. In May 1985, about a month after the birth of his daughter and while Li was away from home working on a fishing boat, government officials seized Li's wife and forced her to have an intrauterine device ("IUD") inserted. In August 1986, Li and his wife secured the services of a private doctor, who removed the IUD. They proceeded to have a second child. Li claimed that the government officials did not know that Mrs. Li was expecting a second child because, early in her pregnancy, she went into hiding at her older sister's home on Launchi Island in Fujian Province. A few weeks after giving birth to her son in 1987, Mrs. Li left the new baby with this older sister and returned to their home village of Guantou to live with Li and their daughter. Li's son remained on the island with his maternal aunt for the next four years, and the Lis would visit him there every two or three months.

In 1992, Li brought his son home to see Li's ailing father.[5] At this time, the child was noticed by the local family planning officials, who insisted that the couple pay a fine of RMB 15,000 and that one of them undergo a sterilization procedure. The officials did not confront the Lis in person, but instead broadcast these sanctions over a loudspeaker to the entire village. Rather than pay the fine and submit to sterili-

---

2. There is also a vestigial Convention Against Torture ("CAT") claim in Li's brief: It is presented in the "Statement of the Issues" section, but never mentioned again. This claim was not made in the administrative proceedings below. As the INA requires petitioners to raise claims to the BIA to preserve them for judicial review, *see* 8 U.S.C. § 1252(d)(1); *Cervantes–Ascencio v. INS*, 326 F.3d 83, 87 (2d Cir.2003), and as we typically do not consider claims not adequately developed in party briefs, *see Yueqing Zhang v. Gonzales*, 426 F.3d 540, 546 n. 7 (2d Cir. 2005), we deny review of Li's CAT claim without further discussion.

3. Li submitted this statement to the INS to replace a different statement that he originally filed with his asylum application. That first statement omitted significant elements— *e.g.*, that Li's second son was in hiding—and differed from the later statement with respect to when his wife was sterilized. Questioned about the discrepancies at his hearing, Li said that the first statement had been drafted by a travel agent and not read back to him. The IJ did not rest his decision on the differences between the first and second I–589 statements.

4. According to Li, the Lis had a "traditional marriage" in 1982, but only registered the marriage officially in 1989.

5. In his I–589 statement, Li indicated that he brought his son home because the family of Li's sister-in-law, who had been concealing Li's son, emigrated to Australia.

zation, the Lis and their children fled by boat back to Launchi Island. But, concerned that the government would find his family, Li fled the country in 1993, after more than a year in hiding.[6] Soon after Li left China in the spring of 1993, Mrs. Li was apprehended by government officials and sterilized against her will.

### B. *Documentary Evidence*

Li also submitted to the IJ a number of documents in support of his claim. Among these were a marriage certificate issued in 1989 ("the 1989 certificate") and a "notarial" marriage certificate[7] issued in 1998 ("the 1998 certificate").[8] These certificates were the subject of much attention in Li's removal proceedings. Both certificates contain the same photograph of Li and his wife. The IJ asked how it was that the two certificates, issued nine years apart, featured the same image. Li explained that his wife made a copy of the original picture for use in the notarial certificate, because Li was no longer in China—and hence, unavailable to pose with her for a new photo—when his wife applied for the notarial certificate in 1998.[9]

The IJ ordered a forensic analysis of the two photographs and certificates. Claude Eaton, a Senior Forensic Document Analyst with the INS, submitted his findings in a report. Eaton could not confirm the authenticity of the 1989 certificate, but the 1998 certificate did "conform[ ] to specimens on file." With respect to the photographs, Eaton concluded that the photo in the 1998 certificate 'is the result of photographing a duplicate of the photograph in [the 1989 certificate].' He explained that "PRC marriage certificates are produced in duplicate; one is issued to the female and the other is issued to the female [sic]." Based on a comparison of the images, Eaton further concluded that the 1989 certificate which Li submitted "is the male's copy; the photograph in [the 1998 certificate] is a copy of the female's marriage certificate." He explained that the photo in the 1989 certificate features "an embossed Chinese character from the seal," and the 1998 certificate's photo has a corresponding "photographed Chinese character," but in a different position—meaning that it was copied from a *different* stamped copy of the same image. Eaton's report also raised the possibility, based on an unexplained shadow, that the original photograph "may be a composite photograph;

---

6. Li's I–589 statement indicated that only five months elapsed between the discovery of his second child by the family planning authorities and Li's flight from China.

7. That is, a certificate obtained from one of China's Notarial Offices ("Gong Zheng Chu"), which are empowered to issue certificates of birth, death, marriage, and divorce. Chinese notaries may issue certificates on the basis of primary or secondary evidence presented to them by applicants, including testimonial evidence, or on the basis of their own independent research. *See* U.S. Department of State, China Reciprocity Schedule, http://travel.state.gov/visa /reciprocity/CountryFolder/C/China.htm (updated Aug. 23, 2005).

8. In addition to the marriage certificates, Li also submitted (1) a 1998 State Department Report on Asylum Claims and Country Conditions for China, (2) uterine x-rays of Liu Bao–Zhu (whom Li identifies as his wife), (3) a letter from Dr. Leon L. Lau stating that the x-ray shows a tubal ligation, (4) a statement from Li's wife's sister corroborating Li's account that she had cared for the Lis' younger child until she herself emigrated to Australia, and (5) photographs, including one of Li with his wife and two children, and two of Li's wife and the children.

9. Li originally told the IJ that his wife made the copy from a negative. After the forensic report was submitted, however, Li explained, under questioning by his own lawyer, that his wife had simply taken a picture, with her own camera, of the 1989 certificate.

i.e., the photograph may have been composed of two separate photographs."

### C. The IJ's Oral Decision

After a brief recitation of the facts, procedural posture, and relevant law, the IJ set forth his grounds for denying both Li's petition for asylum and his petitions for withholding of removal. First, the IJ questioned the corroborating evidence that Li had presented. The IJ focused in particular on the marriage certificates, and the photographs they contained. He noted that the picture in the 1998 certificate was a photograph of the picture in the 1989 certificate. "Therefore," the IJ continued, "it appears that the photograph, whether contained in [either certificate], appears to be a composite photograph." In the IJ's view, this finding reduced Li's credibility dramatically. Li "asserts a statement with regard to his presence in the People's Republic of China with a spouse when the photograph had been taken," but this now "becomes questionable." The faked picture undermines "a material element of his claim, that in fact he's married, and that he has two children." Moreover, because the notarial certificate was not issued until 1998, little weight should be afforded to that document. The IJ also found the notarial birth certificates for Li's children to be unreliable, largely because they were issued so long after the births, and he faulted Li for not producing contemporaneous evidence of the births. The IJ questioned the credibility of the x-ray report, too, because it contained the same photograph that appeared in Li's wife's notarial birth certificate, and because it stated her age as 37, while judging from her birth certificate, she was 36 at the time.

Second, the IJ pointed to Li's failure to provide additional corroborating materials, in particular with respect to his wife's sterilization. Li lacked first-hand knowledge of his wife's sterilization, as he had already fled China when it occurred, but he failed to provide, for instance, an affidavit from his wife "concerning the alleged events, as to the enforcement of the family planning policy."

Third, the IJ addressed Li's testimonial credibility. He noted one specific inconsistency in Li's testimony: his conflicting account of how he how he had located and retained the services of Dr. Lau, who examined the x-rays of Li's wife and wrote the report stating that she underwent tubal ligation. The IJ suggested that the related testimony was "fabricated." More generally, the IJ found Li's demeanor to be hesitant and noted that Li

> would continue searching with his eyes when confronted with inconsistencies and conflicting statements concerning his claim for relief. [Li] had taken two or three water breaks during his testimony, which did not appear to be an attempt to quench the thirst, but appeared to [have] been used as an opportunity to formulate a response when confronted with a conflicting inconsistency. Moreover, each time that [Li] was confronted with an inconsistency or conflict, he became defensive with regard to his testimony.

Summarizing, the IJ labeled Li incredible and inconsistent, and held that Li failed to establish past persecution or a reasonable possibility of future persecution. Accordingly, Li's requests for asylum and withholding of removal were denied.

## II. DISCUSSION

### A. Legal Protections Afforded to Persecuted Aliens

Asylum and withholding of removal under the INA are related, but distinct, forms of relief available to persecuted

aliens. To establish eligibility for asylum, an alien must demonstrate that he is a refugee within the meaning of the INA. *See* 8 U.S.C. § 1158(b)(1); *see also Yueqing Zhang v. Gonzales,* 426 F.3d 540, 544 (2d Cir.2005). "Refugee" is defined, in relevant part, to include persons unable or unwilling to return to their home countries "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Even if an alien establishes refugee status, however, the decision to grant or deny asylum is left to the discretion of the Attorney General. *See* 8 U.S.C. § 1158(b)(1); *see also Islami v. Gonzales,* 412 F.3d 391, 394 n. 3 (2d Cir.2005) (discussing factors bearing on the exercise of discretion); 8 C.F.R. § 1208.13 (setting standards for granting and denying asylum to eligible applicants).

To qualify for withholding of removal, an applicant must clear a higher bar. An alien must show that, if he were removed to his home country (or other designated country), it is more likely than not that his "life or freedom would be threatened" on account of one of the five protected grounds listed above. 8 U.S.C. § 1231(b)(3)(A); *see Joaquin–Porras v. Gonzales,* 435 F.3d 172, 181 (2d Cir.2006); 8 C.F.R. §§ 1208.16(b)(1), (2). But unlike asylum, if an applicant can make this showing, she is entitled to withholding of removal. *See Zhou Yun Zhang v. INS,* 386 F.3d 66, 71 (2d Cir.2004); 8 U.S.C. § 1231(b)(3)(A).

In 1996, Congress amended the INA to provide that forced abortion or sterilization, or persecution for failure to undergo such a procedure or for other resistance to coercive population control programs, constitutes persecution on account of political opinion, and hence, forms a basis for asylum and withholding of removal. 8 U.S.C. § 1101(a)(42)(B) (as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, § 601(a)(1), 110 Stat. 3009–689). Since that time, the BIA has extended refugee status to spouses of aliens who have been subject to forced abortion or sterilization. *See In re C–Y–Z–,* 21 I. & N. Dec. 915, 919–20 (BIA 1997) (holding that either spouse may claim refugee status if the other spouse was forced to undergo an involuntary abortion or sterilization).

### B. *Judicial Review of EOIR Decisions*

■ Authority for deciding asylum and withholding of removal claims rests with the Executive Office for Immigration Review ("EOIR"), the Department of Justice entity that encompasses the IJs and the BIA. *See Edwards v. INS,* 393 F.3d 299, 302 n. 1 (2d Cir.2004). The INA provides for judicial review of EOIR decisions, but the role allotted to courts is carefully circumscribed by the statute. The factual findings of the EOIR are deemed conclusive "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). The Second Circuit interprets this statutory standard to mean that an IJ's factual findings merit deference so long as they are supported by substantial evidence in the record. *See, e.g., Tandia v. Gonzales,* 437 F.3d 245, 249 (2d Cir. 2006) (per curiam); *Diallo v. INS,* 232 F.3d 279, 287 (2d Cir.2000). Following the Supreme Court, we define "substantial evidence" to mean "more than a mere scintilla": it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). *See, e.g., Hong Ying Gao v. Gonzales,* 440 F.3d 62, 65–66 (2d Cir.2006). When the agency's decision rests on credibility findings by an IJ, "we afford particular deference in ap-

plying the substantial evidence standard," recognizing that "the law must entrust some official with responsibility to hear an applicant's asylum claim, and the IJ has the unique advantage among all officials involved in the process of having heard directly from the applicant." *Zhou Yun Zhang*, 386 F.3d at 73 (internal quotation marks omitted).

While the substantial evidence standard leaves the province of factfinding to the agency, it does not permit an appellate court to defer to unreasoned rulings, or those based on legal error, faulty analysis, or misreadings of the record. In rejecting an applicant's account of persecution, "the IJ must provide specific, cogent reasons for doing so," and "[t]hose reasons must bear a legitimate nexus to the finding, and must be valid grounds for disregarding an applicant's testimony." *Secaida–Rosales v. INS*, 331 F.3d 297, 307 (2d Cir.2003) (internal citations and quotation marks omitted). We cannot sustain an adverse credibility finding, for instance, that is "based upon ... a misstatement of the facts in the record [or] bald speculation or caprice." *Zhou Yun Zhang*, 386 F.3d at 74. Similarly, "when a credibility determination analyzing testimony is based on flawed reasoning, it will not satisfy the substantial evidence standard." *Secaida–Rosales*, 331 F.3d at 307. Nor do we owe any deference to the IJ's views on questions of law, *i.e.*, "what evidence will suffice to carry any asylum applicant's burden of proof." *Jin Shui Qiu v. Ashcroft*, 329 F.3d 140, 146 n. 2 (2d Cir.2003); *see also Ming Shi Xue v. BIA*, 439 F.3d 111, 114–15 (2d Cir.2006) (holding that it is error for an IJ to deny relief on the basis of perceived inconsistencies that are not dramatic and self-evident and were never raised in the removal proceeding); *Jin Shui Qiu*, 329 F.3d at 153–54 (holding that it is error

for the BIA to make unreasonable demands for corroboration).

Yet even as we review agency decisions for error, we recognize that, in the design of the INA, the factual determinations at the heart of many asylum and withholding of removal claims cannot be made by courts, but are committed to the EOIR. *See* 8 U.S.C. § 1252(b)(4). Accordingly, when we find fault with an adverse credibility finding, we will not substitute our own judgment for the agency's, but ordinarily will "remand to the agency for additional explanation or investigation." *Twum v. INS*, 411 F.3d 54, 61 (2d Cir. 2005) (quoting *INS v. Ventura*, 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam)); *see also Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 400 (2d Cir.2005) ("To assume a hypothetical basis for the IJ's determination, even one based in the record, would usurp her role."); *Jin Shui Qiu*, 329 F.3d at 149. In other words, as a general rule, a denial of immigration relief stands or falls on the reasons given by the EOIR. *See Yu Sheng Zhang v. U.S. Dep't of Justice*, 362 F.3d 155, 159 (2d Cir.2004) (per curiam). This principled refusal to substitute our reasoning for the agency's is another manifestation of the deference we owe to the EOIR—a recognition that "a judicial judgment cannot be made to do service for an administrative judgment," *Lin Li Hua v. U.S. Dep't of Justice*, —— F.3d. ——, ——, 2006 WL 1755289, at *5, No. 02–4713, 2006 U.S.App. LEXIS 16193, at *17 (2d Cir. June 28, 2006) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943))—even if the result is the vacatur of agency decisions.

It is not the case, however, that any error in the EOIR decision, however slight, is grounds for vacating and remanding. It is a long-standing principle of administrative law that agency errors do not

justify a remand when "remand[ing] would be an idle and useless formality." *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), *quoted in Cao He Lin*, 428 F.3d at 401; *see also Wyman–Gordon Co.*, 394 U.S. at 766, 89 S.Ct. 1426 n. 6 ("*Chenery* does not require that we convert judicial review of agency action into a ping-pong game."). Recent cases in this circuit have begun developing standards for when remanding would be futile, notwithstanding EOIR errors. *Xiao Ji Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 162 (2d Cir.2006), stated that the "overarching test" for futility is "when the reviewing court can 'confidently predict' that the IJ would reach the same decision absent the errors that were made." *Id.* (quoting *Cao He Lin*, 428 F.3d at 395). *Cao He Lin*, decided two months earlier, outlined more of a rule-governed approach to futility, as against the "confident prediction" standard of *Xiao Ji Chen*, specifying three conditions that would justify denying a petition even in the face of EOIR errors:

> (1) the adjudicator explicitly rested its conclusion on alternative grounds, one of which is sustainable; (2) the adjudicator relied so little on the error-infected aspect of its reasoning, that there is no realistic possibility of a different result on remand; or (3) the evidence so overwhelmingly supports the IJ's finding that, notwithstanding identified errors, there is no realistic possibility of a different result on remand.

*Cao He Lin*, 428 F.3d at 395.

■ *Cao He Lin* and *Xiao Ji Chen* addressed futility in different legal con-

texts. *Xiao Ji Chen* involved only withholding of removal and Convention Against Torture claims, while *Cao He Lin* concerned these as well as asylum, which, as noted, imposes a less onerous burden of proof on the applicant than does withholding of removal. It might be thought that the different formulations of a futility test articulated in the two cases correspond to the legal standards at play for the different claims. In fact, however, as we recently said in *Lin Li Hua*, *Cao He Lin* and *Xiao Ji Chen* together outline a single framework that applies to asylum claims as well as to withholding of removal and Convention Against Torture claims. When an EOIR decision contains errors, the operative question for a reviewing court as stated by *Xiao Ji Chen* and *Cao He Lin* is whether we can confidently predict the same result in the absence of errors, and this is so regardless of whether the relief sought is asylum or withholding of removal.[10] For its part, *Cao He Lin* specifies three circumstances in which such confidence would be warranted. *See Lin Li Hua*, 453 F.3d at 99, 106–07, 2006 WL 1755289, at *5, 2006 U.S.App. LEXIS 16193, at *19.

■ Of course, whether under the rubric of *Cao He Lin* or *Xiao Ji Chen*, the futility inquiry is not simply a matter of asking whether, notwithstanding the errors, substantial evidence can be found in the record to support the EOIR's result. Courts' use of the substantial evidence standard reflects the deference that we owe the agency as factfinder, and no such deference is due when the agency's decision rests on legal error. Accordingly, where errors have been found in the EOIR decision, a residue of substantial evidence

---

**10.** Although, as we noted in *Lin Li Hua*, where the case turns on the sufficiency of evidence presented (as opposed to the petitioner's credibility), a lower quantum of evidence may justify a confident prediction with respect to a withholding of removal claim as opposed to an asylum claim, given that the evidentiary burden on an applicant for withholding is steeper. *See Lin Li Hua*, 453 F.3d. at 99, 105, 2006 WL 1755289, at *4, 2006 U.S.App. LEXIS 16193, at *15 n. 5.

in support of the agency's result is a necessary, but not sufficient, condition for denial of review. As *Cao He Lin* and *Xiao Ji Chen* instruct, to deny review in the face of EOIR errors, a court must have confidence that an error-free proceeding would yield the same result.[11] The existence of substantial evidence supporting that result, without more, is not enough to give rise to such confidence.

### C. Reviewing the IJ's Denial of Relief

■ Where, as here, the BIA has adopted the IJ's decision without issuing an opinion of its own, we review the decision of the IJ directly. *Chun Gao v. Gonzales*, 424 F.3d 122, 124 (2d Cir.2005). In reviewing the IJ's decision, we identify a number of errors. Because we are not satisfied that the same result would be reached absent those errors, we remand to the BIA for further proceedings.

■ In finding Li not to be believable, the IJ relied heavily on his conclusion that the photograph in the 1989 and 1998 certificates was a composite. There are two separate problems with this aspect of the IJ's decision.

■ An IJ is, of course, fully entitled to make findings, based on professional analysis and her own examination, about the authenticity of submitted evidence, and such findings ordinarily merit deference. *See, e.g., Borovikova v. U.S. Dep't of Justice*, 435 F.3d 151, 157–58 (2d Cir.2006); *but see id.* at 162–63 (Oakes, *J.*, dissenting) (arguing that there is no substantial evidence to support the IJ's conclusion that petitioner's birth certificate was falsified). But such conclusions may not stand when they are "based entirely on flawed reasoning, bald speculation, or conjecture." *Xiao Ji Chen*, 434 F.3d at 158. The IJ's oral decision indicates that he concluded that the photograph was a fake not on the basis of Eaton's report (which was noncommittal on the issue), but because the same picture appeared in both the 1989 and the 1998

---

11. As we noted recently in *Lin Li Hua,* the fact that *Xiao Ji Chen* and *Cao He Lin* can be harmonized does not mean that all questions about the futility standard have been answered. *See Lin Li Hua,* 453 F.3d at 99, 107–09, 2006 WL 1755289, at *6, 2006 U.S.App. LEXIS 16193, at *21 n. 6. In particular, "the question of in *whose* decision we must have confidence ... remains a potentially complicated one ...." *Id.* Is it the BIA, the IJ who originally denied relief, or some "generic" IJ?

The answer to that question may turn in part on what we perceive to be the object of the futility inquiry. Are we in fact making a prediction, based on the record, about what the result of a remand would be, as the language of some cases suggests? *See Sall v. Gonzales,* 437 F.3d 229, 235 (2d Cir.2006) (per curiam) (granting petition where the panel "cannot confidently state that the IJ *will deny* asylum if we remand") (emphasis added); *see also Ewing v. NLRB,* 768 F.2d 51, 56 (2d Cir.1985) (requiring remand where "[not] all doubt as to how the Board *will decide* the case on remand has been eliminated") (emphasis added). Or are we trying to understand the role that the various errors played in the decision under review, and denying the petition only where we are satisfied that the errors were not a contributing cause of the denial of relief? *See Cao He Lin,* 428 F.3d at 401 ("[W]e are not required to remand where there is no realistic possibility that, absent the errors, the IJ or BIA *would have reached* a different conclusion.") (emphasis added).

The two positions are not necessarily irreconcilable. It might be that remand is unnecessary either if the record allows us to conclude that the BIA, considering the remanded application on a blank slate, would deny relief, *see id.* at 402 (stating that remand should not be required where "overwhelming evidence" supports the agency's result), or if the IJ's errors are slight enough, and the unimpeachable findings substantial enough, to assure us that the errors were not decisive factors in the original result.

Because we need not resolve any of these questions to decide the instant case, *see infra* Subsection II.C, we simply note them for future cases.

certificates. In the IJ's words, "the second photograph, as contained in the notarial certificate, Exhibit 5B, is a photo of that photo [in Exhibit 5A, the 1989 certificate]. Therefore, it appears that the photograph, whether contained in 5A or 5B, appears to be a composite photograph." The conclusion in the second sentence is a *non sequitur*. A credibility finding rooted in flawed reasoning cannot stand. *See Secaida–Rosales*, 331 F.3d at 307 (concerning credibility findings relating to analysis of testimony). It may be that the IJ's conclusion about the photo derives in part from the unjustified assumption, repeated elsewhere in the decision, *see infra*, that the use of the same photograph in different documents is itself suspicious.[12] But to infer from the fact that one picture is the copy of another that both pictures are fakes is to engage in unsupported speculation. *See Jin Shui Qiu*, 329 F.3d at 149 ("Rules of law circumscribe ... the inferences that the BIA may draw in finding facts, and require the BIA to elucidate the basis for its factual conclusions.").

Even if we were to accept the IJ's finding that the photograph is a composite, the IJ's assessment of how the photo affects Li's credibility would still be dubious, because it disregards important record evidence. *See Secaida–Rosales*, 331 F.3d at 308. The IJ concluded that the faked photo compromises Li's credibility with respect to the fundamental factual predicates of his claim—"that in fact he's married, and that he has two children." If the photo in the certificates were the only evidence of the existence of Li's family, then the IJ's finding that the photo was

faked would clearly warrant the IJ's grave doubts about Li's story as a whole. But in fact, the record contains *another photograph* that shows Li with his wife and children, *see supra* note 8, not to mention two other, apparently more recent, pictures of Li's wife with the children, and three passport-style pictures of Li's wife and the two children, who appear in these photos to be teenagers. The IJ does not suggest that any of these other photographs were faked, or that the woman who appears in them is not the woman in the marriage certificate photos. Indeed, the IJ did not discuss these other images at all. Doubts about the marriage certificate photos, then, do not, without more, warrant the conclusion that Li fabricated his wife and children from whole cloth for the purposes of his asylum claim. Looking at the record as a whole, we must conclude that the IJ's credibility findings based on the photograph in the marriage certificates are not supported by substantial evidence. *See Diallo*, 232 F.3d at 287; *see also Tian–Yong Chen v. INS*, 359 F.3d 121, 129 (2d Cir.2004) (vacating a denial of relief where the BIA's ruling overlooked material evidence in the record).

▪ The IJ also gave considerable emphasis to Li's demeanor. According to the IJ, Li (1) appeared "hesitant" when confronted with "inconsistencies and conflicting statements" (never identified by the IJ); (2) took "two or three water breaks during his testimony," which he "used as an opportunity to formulate a response when confronted with a conflicting inconsistency"; and (3) "became defensive"

12. As noted above, Li gave a perfectly reasonable explanation for why the same image was used in both certificates: His wife needed a picture of the two of them together for the 1998 certificate, and he was not available to pose for a new picture, so she copied the picture in the 1989 certificate. The IJ never discussed this explanation in his decision. *See Ramsameachire v. Ashcroft*, 357 F.3d 169, 178 (2d Cir.2004) ("The BIA must give specific, cogent reasons for rejecting the petitioner's testimony.") (internal quotation marks omitted).

when confronted with inconsistencies or conflicts, which, again, the IJ did not identify. Of course, demeanor is paradigmatically the sort of evidence that a fact-finder is best positioned to evaluate. *See, e.g., Jin Chen v. U.S. Dep't of Justice,* 426 F.3d 104, 113 (2d Cir.2005) ("We give particular deference to credibility determinations that are based on the adjudicator's observation of the applicant's demeanor, in recognition of the fact that the IJ's ability to observe the witness's demeanor places her in the best position to evaluate whether apparent problems in the witness's testimony suggest a lack of credibility or, rather, can be attributed to an innocent cause such as difficulty understanding the question."); *Zhou Yun Zhang,* 386 F.3d at 73. But we will not uphold "credibility findings . . . based upon . . . a misstatement of the facts in the record." *Id.* at 74. Here, the record shows that Li asked for only one water break over the course of his removal hearing testimony. He did make a second request for water, but *only after he was excused from the stand.* This second request, obviously, could not have been a ploy to buy some time when faced with a difficult question. The IJ's analysis of Li's demeanor on the stand, then, is compromised by factual error, and, as such, is flawed as a basis for denying relief. *See Chun Gao v. Gonzales,* 424 F.3d 122, 130 (2d Cir.2005) (vacating and remanding an IJ decision that rested, in part, on erroneous statements regarding the record evidence).

In addition, the IJ discounted Li's wife's x-ray certificate indicating sterilization because that certificate contained the same picture of Li's wife as her notarial birth certificate. As with the marriage certificates, the IJ gave no reason—and the record provided no basis—for thinking that authentic documents would contain unique photographs (as they would, for instance, if photographs were taken on-site by the documents' issuing authorities, *e.g.,* for driver's licenses in the United States). Instead, in the case before us, Li testified that his wife was instructed by the doctor to bring in a photograph of herself. The record shows that the x-ray certificate and the notarial birth certificate were issued within two weeks of each other, at a time when Li, her husband, was in removal proceedings. There is nothing suspicious about the idea that Li's wife brought duplicate photographs to the notarial office and the hospital in the course of collecting documentation for her husband's case. The IJ's conclusion that the x-ray is not authentic is therefore speculative, and hence, unsupportable. *See Cao He Lin,* 428 F.3d at 405 (rejecting as "impermissibly speculative" the IJ's conclusion, on the basis of the petitioner's failure to produce an abortion notice, that no abortion was performed, where nothing in the record suggested that forced abortions are usually triggered by a written notice).[13]

It was also error for the IJ to demand contemporaneous documentation

---

**13.** Another reason that the IJ gave for doubting the x-ray certificate—and Li's credibility more broadly—was the one-year discrepancy between his wife's age as listed in that document and in her notarial birth certificate. The difference in age in the documents does not go to the heart of Li's claim of persecution, *see Secaida–Rosales,* 331 F.3d at 309, nor is it incapable of being explained any number of ways. *See, e.g., Chunhong Xu v. Ashcroft,* 108 Fed.Appx. 482, 484–85 (9th Cir. 2004) (unpublished). The IJ did not, however, give Li the opportunity to respond to this perceived inconsistency, *see Ming Shi Xue,* 439 F.3d at 114–15 ("[W]hen an inconsistency is not self-evident, an IJ may not rely on it to support a credibility determination without first bringing the perceived discrepancy to the alien's attention, thereby giving the alien an opportunity to address and perhaps reconcile the seeming inconsistency, to the IJ's satisfaction, at the least.").

of Li's children's births. We have noted before that IJs' standards for written corroboration must be calibrated to the norms and practices of the aliens' home countries, and the circumstances of the aliens' departure. *See Jin Shui Qiu,* 329 F.3d at 153 (suggesting that it may be erroneous for an IJ to require documentation that is not reasonably available to the alien); *see also Diallo,* 232 F.3d at 289 (noting that it is unreasonable to expect an alien to provide certain corroborative documents given the circumstances of his life while about to flee). Here, for example, it is not reasonable to expect the Lis to have any contemporaneous documentation for their son's birth or early childhood, given that the couple purportedly took great pains to conceal that birth. And, since they allegedly were in hiding for nearly a year, it may even be too much to expect that they preserved such documents with respect to their older daughter. *See Jin Shui Qiu,* 329 F.3d at 154 n. 10 (commenting on how the expectation of advanced record-keeping on children's birth certificates *might* be unreasonable in the context of Chinese asylum seekers).

 Having canvassed the IJ's opinion for errors, and having found several, we now consider whether it is appropriate to deny Li's petition notwithstanding the errors. We conclude that it is not appropriate to do so, as we cannot state with confidence that the BIA would reach the same result in the absence of errors. This is not to say, of course, that the record provides no reasons for doubting Li's credibility. It does, and the IJ identified some of them. For instance, Li testified at his removal hearing that he remained on Launchi Island for more than a year be-

fore fleeing to the United States, while his I–589 statement indicated that he departed after only five months. Also, as the IJ noted, Li changed his testimony at the removal hearing about how he came to meet Dr. Lau. But while the evidence in the record might permit a "hypothetical adjudicator" to deny Li's claim, *Jin Shui Qiu,* 329 F.3d at 149, it falls far short of the "overwhelming evidence" that would assure us of the same result on remand, *Cao He Lin,* 428 F.3d at 402.

Nor can we be certain that the IJ's errors did not play a role in the decision to deny relief. If the IJ had given valid, alternative grounds for denying relief, then we could deny review, confident that the identified errors were not responsible for the IJ's outcome. *See Cao He Lin,* 428 F.3d at 401. We might have similar confidence that error was not a determining factor in the result if the IJ's missteps were few and minor, relative to a large number of valid bases for an adverse credibility finding. *See Xiao Ji Chen,* 434 F.3d at 158–60 (finding that the large number of unimpeachable factual findings, relative to IJ's "occasional[ ] lapses" into speculation, give confidence that the same decision would be reached in the absence of the noted deficiencies); *see also Cao He Lin,* 428 F.3d at 402 ("[R]emand may not be required where the IJ or BIA's reliance on an erroneous aspect of its reasoning is so tangential that there is no realistic possibility that the outcome would be different on remand."). Here, however, there is little besides error in the IJ's decision. Again, the IJ correctly noted that Li's testimony regarding Dr. Lau was inconsistent. But no other aspect of his credibility finding is entirely beyond reproach.[14] Giv-

---

14. In considering this point, we need not determine whether the IJ was justified in faulting Li for not providing corroboration of his wife's forced sterilization in the form of, for instance, an affidavit from his wife. *Compare Zhou Yun Zhang,* 386 F.3d at 78 (faulting petitioner for failing to produce an affidavit from his wife describing her forced steriliza-

en the number of errors and the paucity of valid findings, we are in no position to predict with confidence what the outcome of an error-free proceeding would have been. We must, therefore, remand to the BIA.[15]

## III. CONCLUSION

The petition for review is GRANTED. The decision of the BIA is VACATED, and the case REMANDED to the BIA for further proceedings consistent with this opinion.

tion, where the IJ had previously brought the omission to his attention), *with Jin Shui Qiu,* 329 F.3d at 153 (holding that the BIA must "anchor[ ] its demands for corroboration to evidence which indicates what the petitioner can reasonably be expected to provide"). Even assuming *arguendo* that the IJ was justified in this finding, in light of the seriousness and pervasiveness of the other errors, we still lack the level of confidence in the result that we would need to deny review.

**15.** Moreover, we remand both Li's asylum and his withholding of removal claims. As

we noted in *Lin Li Hua,* in cases that turn not on credibility, but on whether the applicant, if believed, has carried the burden of proving eligibility for relief, it may be that remanding a withholding claim would be futile, while remanding a factually-identical asylum claim would not be. *See supra* note 10; *Lin Li Hua,* 453 F.3d at 99, 107–09, 2006 WL 1755289, at *6, 2006 U.S.App. LEXIS 16193, at *21 n. 6. But this is not such a case.